**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CHRISTOPHER A SCAGGS, | ) | CASE NO. 1:25-CV-01447-CEH |
| | ) | |
| Plaintiff, | ) | JUDGE CARMEN E. HENDERSON |
| | ) | UNITED STATES MAGISTRATE JUDGE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | **MEMORANDUM   OPINION   AND** |
| | ) | **ORDER** |
| Defendant, | ) | |
| | ) | |

## I. Introduction

Christopher A. Scaggs ("Scaggs" or "Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits ("DIB"). This matter is before me by consent of the parties under 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. (ECF No. 9). For the reasons set forth below, the Court AFFIRMS the Commissioner of Social Security's nondisability finding and DISMISSES Plaintiff's Complaint.

## II. Procedural History

On September 3, 2018, Scaggs filed an application for DIB, alleging a disability onset date of July 20, 2018.  (ECF No. 8, PageID #: 52). The application was denied initially and upon reconsideration, and Scaggs requested a hearing before an administrative law judge ("ALJ").  (*Id.*). On September 27, 2019, an ALJ held a hearing, during which Claimant, with the benefit of a non-attorney representative, and an impartial vocational expert testified.  (*Id.* at PageID #: 68-101).  On November 1, 2019, the ALJ issued a written decision finding Scaggs was not disabled.  (*Id.* at PageID #: 52-63).  The ALJ's decision became final on July 30, 2020, when the Appeals Council

1

declined further review.  (*Id.* at PageID #: 38-40).  Scaggs then appealed the decision to this Court, and, on the parties' stipulation, the undersigned remanded the matter for further proceedings.  (*Id.* at PageID #: 802).

On remand, the Appeals Council ordered the ALJ to "offer the claimant the opportunity for a hearing, address the evidence which was submitted to the Appeals Council, take any further action needed to complete the administrative record and issue a new decision."  (ECF No. 8, PageID #: 810).  The ALJ held a second hearing on August 10, 2023, during which Claimant, represented by counsel, and an impartial vocational expert again testified.  (*Id.* at PageID #: 736-71).  On September 13, 2023, the ALJ issued a written decision again finding Scaggs was not disabled.  (*Id.* at PageID #: 715-29).  The Appeals Council declined further review on March 14, 2025.  (*Id.* at PageID #: 700-04).

On July 10, 2025, Scaggs filed his Complaint to challenge the Commissioner's final decision.  (ECF No. 1.)  The parties have completed briefing in this case. (ECF Nos. 12, 14, 15).  Scaggs asserts the following assignments of error:

> (1) The ALJ failed to properly evaluate the medical opinion evidence.
>
> (2) The ALJ failed to properly evaluate Plaintiff's subjective statements.
>
> (3) The ALJ relied on a flawed hypothetical question to the vocational expert.

(ECF No. 12 at 1).

## III. Background

### A. Relevant Disability Allegations

The ALJ summarized Scaggs's relevant disability allegations:

> The claimant alleged disability due to severe depression and anxiety,

2

> bipolar, ADHD, muscle issues, and high blood pressure. He
> weighed 279 pounds at 5'11" (1E). He reported constant pain and
> stated it was hard to sit down and stand up, and he was constantly
> depressed (4E). He reported having different things running through
> his mind, and he just needed time to get his head right (6E). He
> reported being depressed and angry, with social anxiety and vivid
> dreams that don't stop (7E).

(ECF No. 8, PageID #: 721).

## B. Relevant Medical Evidence

The ALJ also summarized Scaggs's health records and symptoms concerning his mental

impairments:[1]

> Signature Health records show medication management for
> psychological symptoms with Rachael McLaughlin, CNP starting in
> August 2018. Diagnoses include Major depressive disorder and
> Generalized anxiety disorder, with PTSD added in September 2018,
> Bipolar disorder added in October 2018, and ADHD added in July
> 2019 (11F/7). At intake in August 2018, he reported increased
> anxiety and depressive symptoms, with a family history of bipolar
> disorder. He was separated from his wife, but they lived in a duplex
> together with his wife and their two children ages 10 and 2 living
> downstairs and him living upstairs. He was currently working as a
> laborer for Chemical Solvents and received short term disability for
> GI issues and was set to return to work next week, but he stated he
> thought he would quit because the work environment is "toxic" and
> increased his anxiety. He also failed a drug test for marijuana and
> reported his boss causes [sic] him derogatory names because he
> considers him an addict now. He had an upcoming job interview
> with Frito Lay. He stated he overthinks things and experiences
> racing thoughts and reported arguments at work (1F/4). He returned
> in September 2018 for psychiatric evaluation. Mental status exam
> notes he was oriented x3 with good hygiene, consistent eye contact,
> intact strength, steady gait, adequate attention/concentration,
> appropriate/depressed/friendly/   pleasant/mildly   anxious
> mood/affect, circumstantial speech, normal language, logical
> thoughts, intact associations, no SI/HI, average fund of knowledge,
> intact memory, fair judgment, but poor coping. He stated he had
> been on Zoloft for 3-4 years and was started on buspirone a month
> ago, but he was not sure if it was helping. He reported having issues
> since his grandfather's death in April 2017. Zoloft was increased at

---

[1] Plaintiff does not challenge the ALJ's consideration of his physical impairments so the Court limits its review to his mental impairments.

3

that time (1F/6-12). At follow up in October 2018, he reported that other people around him had noticed an improvement in his attitude, and he was more patient with his 2-year old, but he felt depressed every day at some point in the day and felt hopeless and worthless regarding his job and finances, with difficulty focusing and loss of interest. He was off work for six more weeks and was not motivated to return because the job exacerbates his anxiety. Latuda was added at that time for possible bipolar depression (2F/8). In November 2018, he reported feeling better after taking Latuda at night. He did not have much of an appetite and was having "odd" mood swings, irritability, and feeling more isolated but he felt his overall mood had been more pleasant, and his wife indicated he had been better to be around. His mental status exam notes that he was oriented, had good hygiene, and had a steady gait. His mood was appropriate but was depressed. Thought process was logical and linear, his fund of knowledge was average, and memory was intact. He had fair insight and judgment, but poor coping. (2F/14).

In January 2019, he reported he returned to work, but his plant manager wrote him up for failing a drug test and missing work (2F/27). He reported he was starting a new part-time job at Home Depot in February as a parking lot attendant. He denied feeling anxious about starting work but worried about being talked down to, which he said was just part of his personality. He stated his relationship with his wife was good lately, and he denied being as irritable and denied isolating. He had some guilt regarding job and finances. He was getting 8 hours of sleep. They discussed adding counseling as part of his treatment, but he decided to just stick with meds for now due to lack of insurance. Mental status indicates he was appropriate, slightly depressed, friendly, pleasant, mildly anxious, with normal speech/language, logical thoughts, intact associations, no SI/HI, intact memory, fair judgment and poor coping (6F/35-38). He only worked 4 hours at Home Depot and quit, stating he did not sleep all weekend worrying about starting work (6F/45). In April 2019, he reported getting a part time job at Walmart and was looking forward to it (6F/71), but in May 2019, he stated he did not take the job because he was not ready to go back to work. Mental status exam notes he was oriented x3, well dressed and groomed with good eye contact, cooperative, no motor agitation, steady gait, appropriate attention/concentration, euthymic mood, normal speech, logical thoughts, appropriate associations, average fund of knowledge, intact memory, and fair judgment/insight (6F/76-80).

In July 2019, he requested something for ADHD, but he was advised that they would hold off at that time, as it was difficult to assess this

4

in light of overlapping mood and anxiety disorder and possible sleep apnea (6F/58). However, he again requested something for ADHD later that month, stating he gets distracted and walks away from projects and does not listen and loses things, and he was trialed on methylphenidate at that time (6F/15-16). In September 2019, he reported improvement with methylphenidate. He stated he was pacing less and could concentrate better. He was able to play with his son without losing his patience. His mood was better, he was not as irritable, and he denied isolating. He stated he is depressed in the morning if he does not have cigarettes, but he has had cigarettes. He was doing side work and odds and ends to supplement his rent (8F/32). Medications as of October 2019 included Zoloft, Latuda, and methylphenidate. He stated that with methylphenidate, he was pacing less, and his concentration was slightly better, stating he was able to play with his son without losing patience. He denied isolating or lying in bed all day and stated he had been cleaning up after himself, vacuuming, and cleaning up after the dogs (11F/8). His April 2020 mental status exam notes he was appropriate, hopeful, friendly, pleasant, with no apparent anxiety, normal speech/language, logical thoughts, intact associations, no SI, average knowledge, intact memory, fair judgment and poor coping (11F/27). In May 2020, he reported an increase in Zoloft had been helpful for anxiety. He was maintaining employment, but his hours were cut down due to COVID-19. He denied anger and racing thoughts and reported irritability was better, and he reported depression at 5/10 and anxiety at 3/10. Mental status exam notes he was depressed but with no apparent anxiety and was appropriate, friendly, and present with intact memory, normal speech/thoughts, no SI, and average fund of knowledge (11F/33-36).

In July 2020, he was working third shift in machine operating. He denied work stress and stated he was told he is doing a good job. He was off the stimulant, methylphenidate, and could not restart it until his blood pressure could be checked. Motivation was good, and he denied issues getting out of bed. He was getting at least 6 hours of sleep and denied anger outbursts, racing thoughts, and issues with concentration and reported decreased irritability and dwelling on things. He and his wife were no longer separated, and they were working on things. Mental status notes he was appropriate, euthymic, friendly, pleasant, with no apparent anxiety, logical thoughts, normal speech and language, average fund of knowledge, and intact memory. He was continued on only Zoloft and Latuda (11F/40-43). In October 2020, he continued to work third shift in machine operating and denied work stress and stated his work performance waws [sic] good. He stated he continued to overthink things and dwell on things, but less. He continued to smoke

5

marijuana up to once a day. Depression was 1/10 and anxiety was 3/10. He was still only taking Latuda and Zoloft (11F/49).

(ECF No. 8, PageID #: 722-24).

## IV.    The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

1. The claimant last meets the insured status requirements of the Social Security Act on December 31, 2027.

2. The claimant engaged in substantial gainful activity during the following periods: July 1, 2020 through present (20 CFR 404.1520(b) and 404.1571 et seq.)

3. However, there has been a continuous 12-month period(s) during which the claimant did not engage in substantial gainful activity. The remaining findings address the period(s) the claimant did not engage in substantial gainful activity.

4. From the alleged onset date through June 30, 2020, the claimant had the following severe impairments: Mild patellar spurring on the right knee; Essential hypertension; Obesity; Depressive, bipolar and related disorders; Anxiety and obsessive-compulsive disorders; and Learning disorders (20 CFR 404.1520(c)).

5. From the alleged onset date through June 30, 2020, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

6. After careful consideration of the entire record, I find that, from the alleged onset date through June 30, 2020, the claimant had the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except can frequently climb ladders, ropes, or scaffolds. Can frequently kneel, crouch, or crawl. Limited to performing simple, routine tasks. Limited to routine workplace changes.

7. From the alleged onset date through June 30, 2020, the claimant was capable of performing past relevant work as a janitor. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

6

8.  The claimant was not under a disability, as defined in the Social Security Act, at any time from July 20, 2018, the alleged onset date, through the date of this decision (20 CFR 404.1520(f)).

(ECF No. 8, PageID #: 717-18, 720, 727, 729).

## V. Law & Analysis

### A. Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

### B. Standard for Disability

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the

7

claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.*

### C.  Discussion

Scaggs raises three issues on appeal, challenging (1) the ALJ's consideration of the medical opinions; (2) the ALJ's treatment of Plaintiff's subjective complaints; and (3) the reliance on an allegedly flawed hypothetical to the vocational expert.  (ECF No. 12 at 1).

### 1.  Consideration of Medical Opinions

Plaintiff first challenges the ALJ's consideration of medical opinions from CNP Rachael McLaughlin, Dr. William Miller, and the State agency psychological consultants.  (ECF No. 12 at 13-23).

Before proceeding to step four, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. § 404.1520(e).  Under the current regulations, the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to

8

any medical opinion(s) or prior administrative medical finding(s)." 20 C.F.R. § 404.1520c(a). Nevertheless, an ALJ must "articulate how [he] considered the medical opinions and prior administrative medical findings" in adjudicating a claim. *Id.* Medical source opinions are evaluated using the factors listed in 20 C.F.R. § 404.1520c(c). The factors include supportability; consistency; the source's relationship with the claimant; the source's specialized area of practice, if any; and "other factors that tend to support or contradict a medical opinion." 20 C.F.R. § 404.1520c(c). The ALJ is required to explain how he considered the supportability and consistency of a source's medical opinion but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2). Under the regulations, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be" and "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical findings(s) will be." 20 C.F.R. § 404.1520c(c)(1)-(2).

   a. *McLaughlin*

The ALJ provided the following discussion of McLaughlin's opinion:

> Rachael McLaughlin, CNP completed the same checklist-type questionnaire three times, once in February 2019, again in September 2019, and again in March 2023. She noted diagnoses of Bipolar disorder, Generalized anxiety disorder and PTSD, with an additional diagnosis of ADHD in the second and third forms, and noted a multitude of symptoms. In understanding and remembering, she indicated none/mild to moderate limitations in the first and then moderate to marked in the second. She indicated moderate to marked in concentration and persistence in both questionnaires, except in the first, she indicated none/mild limitations in carrying out simple, 1-2 step instructions. She indicated none/mild to marked in social interactions and none to moderate/marked in adaptation.

9

She checked the box indicating the claimant would be absent from work more than three times per month. On the 2023 form, she indicated none/mild to moderate limitations in understanding/remembering and adaptation, and none/mild to moderate/marked limitations in concentration/persistence and social interactions. This time, she indicated one absence per month. She again noted a multitude of symptoms, but indicated that depression and irritability wax and wane and are controlled with medication, and attention/concentration are stable with medication (5F; 7F; 13F). These forms are unpersuasive, for several reasons. First, it is unclear what the significant change was between the first two forms and the more recent one, as he continues to be on the same medications that he was taking at that time- Latuda, Zoloft, and methylphenidate. He was started on methylphenidate in July 2019, and records do show improvement at that time; however, when he was off this medication in July 2020, he still was doing well and was working full time (see 11F/40). In fact, he did not restart taking it again until October 2021, when he reported some difficulty keeping up with productivity at work due to problems with focus, although he had been working over a year by this time without methylphenidate. Nonetheless, it did help, and at follow up in December 2021, he reported it was working, and he got a raise at work, which he was excited about (see 12F/30,35). Mental status exams from the months before he started working are consistent with those from after he started working, except he was not noted to be depressed after he started working, and there is no explanation for the change in mood other than that it improved with going to work (see 11F/26, 33, 40, 46, 53, 60). While the claimant reported issues with attention and concentration while he was not working, he has continued to report issues even while maintaining full time employment, although he was not taking medications for it for a long period of time. Likewise, he has reported variable depression, anxiety, irritability, racing thoughts, dwelling on things, and overthinking at times, consistent with his complaints during the time before he resumed working, yet he has continued to progress at work and is now a supervisor (see 12F/9, 14, 20, 25, 30, 35). Further, as discussed above, despite his symptoms, he was still able to play cards, spend time with friends, family, and neighbors, and was consistently noted to be cooperative and pleasant. He managed personal care, watched TV, played with his kids, changed diapers, cared for pets, drove, shopped, cooked, did laundry, took out the trash, took the dogs out, cleaned, managed money, paid the bills, and managed a checking account (see 4E; 9F). The records do not support the marked limitations noted by Ms. McLaughlin with excessive absences, given overall improvement with medications, and her opinion is, therefore, unpersuasive.

(ECF No. 8, PageID #: 724)

Plaintiff argues the "ALJ's evaluation of the opinions from treating psychiatric N.P. McLaughlin is fatally flawed." (ECF No. 12 at 14). Plaintiff argues that while the ALJ concluded Plaintiff was on the same medications both during the period he alleges disability and when he returned to work, the records negate this statement and show general improvement in the period leading up to Plaintiff's return to work. (*Id.* at 14-15). Plaintiff further argues that McLaughlin's opinion was supported by appropriate medical findings, including her own observations of Plaintiff, and consistent with the treatment record. (*Id.* at 15-18). Additionally, Plaintiff argues the ALJ erred in relying on Plaintiff's daily activities to find McLaughlin's opinions unsupported because Plaintiff's daily activities do not equate to an ability to sustain full-time work. (*Id.* at 18-19).

The Commissioner responds that the ALJ properly considered the supportability and consistency factors in finding McLaughlin's opinions unpersuasive. (ECF No. 14 at 10-11). While the Commissioner acknowledges that "there was evidence that Plaintiff was advised to stop taking [methylphenidate] in April 2020," he argues that any error by the ALJ in relying on Plaintiff being on the same medications during both the alleged period of disability and his return to work was harmless because the ALJ "gave other valid reasons for not crediting NP Laughlin's assessments," including that mental status examinations and daily activities. (*Id.* at 11-12).

Plaintiff replies that the Commissioner "mischaracterizes the record" because McLaughlin indicated her 2019 opinion was based on evidence of "depressed mood, persistent or generalized anxiety, an irritable affect, feelings of guilt or worthlessness, hostility or irritability, periods of hypomania, difficulty thinking or concentrating, easy distractibility, flight of ideas, intrusive recollections of a traumatic experience, vigilance and scanning, anhedonia/pervasive loss of

interests, decreased energy, motor tension, psychomotor agitation, pressured speech, social withdrawal or isolation, somatization unexplained by organic disturbance, and sleep disturbances," but McLaughlin's 2023 opinion described Plaintiff only as having a *history* of "anhedonia/pervasive loss of interests, decreased energy, pressured speech, and social withdrawal or isolation." (ECF No. 15 at 1). Plaintiff also asserts that "the later report indicated that Mr. Scaggs symptoms were 'controlled with medication,'" which supported a change in the findings relied on by McLaughlin. (*Id.* at 1-2).

Having reviewed the ALJ's decision, the Court concludes the ALJ addressed both supportability and consistency in analyzing McLaughlin's opinion. As to supportability, the ALJ noted the lack of support for the changes in Plaintiff's limitations given that he was on the same medications when the opinions were authored. (ECF No. 8, PageID #: 724; *id.* at PageID #: 639 (Latuda 80 mg, Zoloft 100 mg, and methylphenidate 40 mg in September 2019), 1140 (Latuda 80 mg, Zoloft 200 mg, and methylphenidate 20mg – 40 mg in March 2023)). While Plaintiff correctly notes that Plaintiff was not taking methylphenidate at the time he returned to work in July 2020 after having been advised in February 2020 to hold this medication, the record reflects that this was due to concern over prescribing a stimulant due to high blood pressure. (*See id.* at PageID #: 1057, 1064, 1071). However, in October 2021, Plaintiff was placed on a trial of methylphenidate and his dosage was increased sometime prior to June 15, 2022. (*Id.* at PageID #: 1120, 1137). Thus, the ALJ correctly noted that Plaintiff was on the same medications when McLaughlin completed both the September 2019 form—while Plaintiff was allegedly unable to work—and the March 2023 form, when Plaintiff was successfully working. (*Id.* at PageID #: 724). The ALJ also addressed consistency, specifically by noting that mental status exams were similar in the period before Plaintiff started working and after, with the only notable difference being that "he

12

was not noted to be depressed after he started working." (*Id.* at PageID #: 725). A review of the medical evidence—including McLaughlin's own treatment notes—supports this conclusion. (*Compare id.* at PageID #: 555-56, 562-63, 571-72, 630-31, 648 (all noting Plaintiff's attention and concentration as adequate and mood as "[a]ppropriate, depressed, friendly, pleasant, mild anxiety" at various points in 2018 and 2019) *with id.* at PageID #: 1061, 1075, 1081, 1088, 1095 (all noting attention and concentration as "[i]mpaired per patient" and mood as "[a]ppropriate, … friendly, pleasant, no apparent anxiety" and either euthymic, depressed, or hopeful in 2020 and 2021)).

Because the ALJ properly considered both the supportability and consistency factors when assessing McLaughlin's opinion, and because substantial evidence supports the ALJ's conclusion, the Court must accept them, "even if substantial evidence would support the opposite conclusion." *Napier v. Comm'r of Soc. Sec.*, 127 F.4th 1000, 1007 (6th Cir. 2025); *see Greene ex rel. Green v. Astrue*, No. 1:10-cv-0414, 2010 WL 5021033, at *4 (N.D. Ohio Dec. 3, 2010) ("[A] claimant does not establish a lack of substantial evidence by pointing to evidence of record that supports her position. Rather, [the claimant] must demonstrate that there is no sufficient evidence in the record that would allow a reasoning mind to accept the ALJ's conclusion.").

  b. *Dr. Miller*

The ALJ provided the following discussion of Dr. Miller's opinions:

> The claimant had a psychological evaluation with William Miller, PhD on August 15, 2019, and Dr. Miller submitted his findings and filled out the same forms which had been filled out by NP McLaughlin. In his evaluation, Dr. Miller indicated that he reviewed records from Signature Health, including the August 2018 assessment by Christine Dinardo, LISW, the September 2018 psychiatric evaluation by Rachael McLaughlin, NP, and follow up notes through January 2019, as well as Ms. McLaughlin's assessment form she had completed in February 2019. Dr. Miller notes that the claimant last worked in 2018 as a laborer and went on

13

short term disability due to gastrointestinal problems, and that the work environment was "toxic" and increased his anxiety. He had started taking Latuda and Zoloft prior to Dr. Miller's evaluation, but he reported he had just started taking Ritalin that day. The claimant admitted that he had used marijuana every day since his grandfather died and continued to use it daily, as it helps keep his depression under control. Dr. Miller's mental status exam notes the claimant had adequate hygiene, was well oriented, with normal speech, average intelligence with somewhat limited fund of information, no delusions/hallucinations/obsessions, intact memory, with some capacity for abstraction, and slightly reduced judgment. He did have a downcast expression and stated that he used to love to work and loved doing things, but he was put in a depression when his grandfather died, who was near and dear to him, and he was being put down at work due to failing a drug test, and he now did not have anyone to talk to. He stated that his grandfather dying was the worst thing that happened to him in his entire life, and he had flashbacks of the day he died. Dr. Miller diagnosed Major depressive disorder, noting that the claimant did not report every [sic] having experienced a manic episode. The claimant reported high anxiety, with panic attacks previously occurring once or twice a week, but now he hadn't had one in a couple of months. Dr. Miller noted that the MMPI-2 was administered to clarify the claimant's diagnoses, but an invalid profile was obtained, as the claimant responded in an exaggerated manner, endorsing a wide variety of symptoms and attitudes. He also noted that the claimant's responses on the Brief Battery for Health Improvement 2 also raises questions about the credibility of the claimant's self-reports, which may be inflated. He stated he spent his days watching TV, pacing the floor, playing with his kids, changing diapers, and hanging out with the neighbors. He also reported he drives, does laundry, takes out the trash, takes the dogs out, cleans, manages money, pays the bills, and manages a checking account.

Dr. Miller provided a functional assessment at 9F and 10F, and the assessments are overall persuasive regarding moderate limitations in understanding/remembering, concentration, and adaptation, but the noted moderate to marked limitations in interaction are unpersuasive. Regarding understanding and memory, on the form at 10F, he indicated moderate limitations with remembering locations and work-like procedures and understanding and remembering detailed instructions, with no/mild limitations with understanding and remembering one to two step instructions. While moderate limitations in detailed instructions is consistent with his findings, it is unclear what the limitations regarding remembering locations and work-like procedures is based on, as there is no indication of issues

14

with memory. Dr. Miller noted the claimant interacted cooperatively and attentively with the examiner, following basic instructions, and based on mental status tasks, he had intact short and medium term recall, intact working memory and mental control, and a slightly reduced fund of general information. Nonetheless. moderate limitations with detailed tasks is persuasive and is consistent with a restriction to simple, routine tasks. At 10F, Dr. Miller noted moderate to marked impairment with maintaining attention and concentration for extended periods and completing a workday without interruptions from psychological symptoms, with moderate limitations with carrying out detailed instructions working with/near other without being distracted, and performing at a consistent pace without unreasonable rest periods. Again, the records overall support impairment in managing attention and concentration for more detailed tasks, supportive of a restriction to simple, routine tasks. However, limitations regarding pace, excessive rest periods, and being distracted by others is unpersuasive, as Dr. Miller notes that the claimant did not display obvious difficulties in this area during the mental status examination, noting he displayed slightly reduced fund of general information, with intact short- and medium-term recall and intact working memory and mental control, and he was reasonably attentive and cooperative throughout the evaluation. Further, records since this time note improvement with methylphenidate, and any remaining limitations in this area are accommodated by a restriction to simple, routine tasks. In fact, Dr. Miller noted no/mild limitations with carrying out simple one to two step instructions, performing activities within a schedule and consistently being punctual, sustaining an ordinary routine without supervision, and making simple work-related decisions. Further, the claimant reported he is able to complete many activities, including watching TV, changing diapers, driving, doing laundry, cleaning, managing money, paying bills, and managing a checking account.

On the form at 10F, Dr. Miller indicated the claimant has moderate to marked limitations with accepting instructions and responding appropriately to criticism from supervisors, getting along with coworkers or peers without distracting them, and maintaining socially appropriate behavior, but he noted no/mild limitations with interacting appropriately with the public, asking simple questions/requesting assistance, and adhering to basic standards of neatness. Moderate to marked limitations in this area is not persuasive. First, it is somewhat inconsistent to note moderate to marked limitations with maintaining socially appropriate behavior, yet no limitations with interacting appropriately with the public. Dr. Miller noted that the August 2018 assessment indicated the claimant described confrontations in the workplace and noted "lack of

15

emotion regulation," and the claimant reported to Dr. Miller an altercation with another driver after a near collision, but stated that this was his "first and only altercation." Additionally, the claimant reports that socially, he is doing "pretty good", and his wife is his primary social contact, although at that time, he had some tension in the relationship, and he reported that he plays with the kids and hangs out with the neighbors. Further, Dr. Miller noted the claimant interacted cooperatively and attentively and had normal speech, and treatment notes from Signature Health also consistently note that he is cooperative, appropriate, friendly, and pleasant with good eye contact. Therefore, the records support only mild limitations in interacting and relating with others.

Regarding adaptation, at 10F, Dr. Miller noted moderate impairment in responding appropriately to workplace changes and making plans independently, but no or mild limitations with being aware of hazards and taking precautions, traveling to unfamiliar places or using public transportation, and setting realistic goals. While the claimant reported panic attacks and crying spells a few months prior to this evaluation, he stated they had been occurring much less frequently, and it had been a couple months since his last one. Dr. Miller notes that these appear to be associated with the period following his grandfather's death, although he also reported some tearfulness when thinking about the things he used to do. The noted moderate impairment in this area is persuasive, and it is consistent with a restriction to an environment with only routine workplace changes. Finally, Dr. Miller's opinion regarding more than three absences per month is not persuasive, as Dr. Miller does not provide specific support for such an assertion. He does note the claimant's symptoms, but he does not indicate how they are severe enough to result in absences. He notes that the claimant's most frequent/severe symptoms are depressed mood and panic attacks, but he then notes that the panic attacks have reduced in frequency. Further, as discussed above, the mental status exam is overall normal, and while the findings are based primarily on the claimant's subjective report, Dr. Miller indicated that he responded to the MMPI-2 "in an exaggerated manner endorsing a wide variety of symptoms and attitudes" and that the results are "not likely a valid indication of his personality and symptoms, and Brief Battery for Health Improvement 2 results showed "strong bias [which] raises questions about the credibility of his self-reports, which may be inflated." Dr. Miller's own statements call into question the basis of his finding regarding excessive absences, which is the claimant's own reported symptoms (9F; 10F).

(ECF No. 8, PageID #: 725-27).

Plaintiff argues the ALJ's analysis Dr. Miller's opinions was "flawed" because while Dr. Miller concluded Plaintiff had moderate limitations in his ability to "(1) remember locations and work-like procedures; (2) work in coordination with or near others without being distracted by them; (3) perform at a consistent pace without rest periods of unreasonable length or frequency; and (4) make plans independently" and the ALJ found these opinions persuasive, the RFC "does not include any restrictions in Plaintiff's ability to remember locations and work-like procedures; work in coordination with or near others without being distracted by them; perform at a consistent pace without rest periods of unreasonable length or frequency; and/or make plans independently." (ECF No. 12 at 19).  Plaintiff asserts that the ALJ "did not indicate why she failed to adopt all the moderate mental limitations identified by Dr. Miller" in violation of Social Security Ruling ("SSR") 96-8p.  (*Id.*).

The Commissioner argues the ALJ appropriately concluded that Dr. Miller's opinions were inconsistent with the record and unsupported by his own observations.  (ECF No. 14 at 15). Contrary to Plaintiff's position, the Commissioner argues the ALJ's decision makes clear that she did not find the limitations regarding remembering locations and work-like procedures persuasive such that she was not required to account for them in the RFC.  (*Id.* at 16).

The Court finds the Commissioner's argument persuasive.  SSR 96-8p provides that "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."  SSR 96-8p, 1996 WL 374184, at *7.  The ALJ complied with this requirement when she provided a detailed discussion indicating that she found Dr. Miller's opinions "overall persuasive" but explaining why she found certain specific limitations unwarranted.  (ECF No. 8 at PageID #: 726-27).  As to Plaintiff's limitations regarding remembering locations and work-like procedures, the ALJ explained that "it is unclear" what these

17

limitations were based on as "there is no indication of issues with memory" and Dr. Miller noted that Plaintiff "follow[ed] basic instructions, and based on mental status tasks, he had intact short and medium term recall, intact working memory and mental control, and a slightly reduced fund of general information." (*Id.* at PageID #: 726).  Similarly, the ALJ explained that Dr. Miller's opinion regarding "limitations regarding pace, excessive rest periods, and being distracted by others is unpersuasive" based on Dr. Miller's notes that Plaintiff "did not display obvious difficulties in this area during the mental status examination, noting he displayed slightly reduced fund of general information, with intact short- and medium-term recall and intact working memory and mental control, and he was reasonably attentive and cooperative throughout the evaluation." (*Id.*).  The ALJ also found the limitations regarding interacting with others unpersuasive because they were inconsistent with Dr. Miller's own observations and Plaintiff's reports. (*Id.* at PageID #: 726-27).  The ALJ further explained that any remaining limitations were accounted for by a limitation to simple, routine tasks. (*Id.*).

Contrary to Plaintiff's argument, the ALJ complied with SSR 96-8p and provided a detailed discussion of why specific portions of Dr. Miller's opinion were not adopted.  The Court finds no error in the ALJ's analysis.

### c. State Agency

The ALJ provided the following discussion of the relevant State agency opinions:

> The DDS psychological consultants found the claimant restricted to simple one to four step tasks in a relatively static setting where major changes can be explained in advance (1A; 3A). These findings are persuasive, as they are consistent with a history of learning disorder with moderate impairment in attention and concentration and adaptation, although there is noted improvement with medications. While he has symptoms of depression, he is still able to play cards, spend time with friends, family, and neighbors, and is consistently noted to be cooperative and pleasant. He reports he managed personal care, watched TV, played with his kids, changed diapers,

18

> cared for pets, drove, shopped, cooked, did laundry, took out the trash, took the dogs out, cleaned, managed money, paid the bills, and managed a checking account (see 4E; 9F). Therefore, there is nothing to support additional limitations beyond a restriction to simple, routine tasks, with only routine workplace changes.

(ECF No. 8, PageID #: 724).

Plaintiff challenges the ALJ's conclusion that the State agency opinions were persuasive because the ALJ "neglected to explain how the opinions from the non-examining consultants here are better supported and more consistent with the record than those from the treating and examining specialists." (ECF No. 12 at 21). Additionally, Plaintiff argues the State agency consultants "did not consider an extensive portion of the psychiatric treatment record that directly contradicts their conclusions on [his] mental functioning." (*Id.*).

The Commissioner responds that the ALJ provided a sufficient discussion of how she analyzed the supportability and consistency factors in finding the State agency opinions persuasive. (ECF No. 14 at 18). The Commissioner argues that "an ALJ may rely on a state agency reviewer who did not review the entire record, so long as the ALJ also considers the evidence post-dating the opinion, which is what happened in this case." (*Id.* (citation modified)).

Importantly, in asserting that "conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors," Plaintiff cites cases that were decided in 2013 or earlier that relied on the "treating source" rule set out in 20 C.F.R. § 404.1527. *See, e.g., Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374-76 (6th Cir. 2013). However, the relevant regulations have been amended and for claims filed after March 27, 2017, like Plaintiff's, medical opinions are now considered under 20 C.F.R. § 404.1520c. This section specifically provides that an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from

19

[a claimant's] medical sources." 20 C.F.R. § 404.1520c(a).  Thus, contrary to Plaintiff's argument, the ALJ was not required to explain why she found the non-examining opinions more persuasive than the opinions from the treating and examining sources.  Rather, as the Commissioner argues, the ALJ was simply required to address the supportability and consistency of these opinions.

Although brief, the ALJ's discussion adequately addressed the supportability and consistency factors.  The ALJ indicated the limitations were supported by Plaintiff's history of learning disorder and social activities, including playing cards, that were indicated in the opinions. (*See* ECF No. 8 at PageID #: 126-29, 132-34, 147-49).  The ALJ also found that the limitations were consistent with Plaintiff's own reports that he could manage his personal care, watch TV, play with his kids, change diapers, care for pets, drive, shop, cook, do laundry, take out the trash, take the dogs out, clean, manage money, pay bills, and manage a checking account.  (*See id.* at PageID #: 351-58, 686).  To the extent Plaintiff argues the ALJ should not have relied on the State agency opinions because the reviewers had not reviewed all the relevant medical records, "it is not error for an ALJ to rely on medical opinions from physicians who have not reviewed the entire record so long as the ALJ considers the post-dated evidence in formulating her opinion. *Edwards v. Comm'r of Soc. Sec.*, No. 1:17 CV 925, 2018 WL 4206920, at *6 (N.D. Ohio Sept. 4, 2018) (*citing McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009) (indicating that an ALJ's reliance upon state agency reviewing physicians' opinions that were outdated was not error where the ALJ considered the evidence developed post-dating those opinions)).  Here, the ALJ's discussion of the medical history makes clear that she considered the additional evidence that was not reviewed by the State agency and found that it was consistent with the opined limitations and ultimate RFC.  (*See* ECF No. 8, PageID #: 721-24).  Accordingly, the ALJ did not err in considering the State agency opinions.

### 2.   Consideration of Subjective Complaints

Plaintiff next challenges the ALJ's consideration of his subjective complaints.

The evaluation of a claimant's subjective complaints rests with the ALJ.  *See Siterlet v. Sec'y of HHS*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers*, 486 F.3d at 248 (noting that "credibility determinations regarding subjective complaints rest with the ALJ").  In evaluating a claimant's symptoms, an ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence in the record.  20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304.

Beyond the medical evidence, an ALJ should consider daily activities; location, duration, frequency, and intensity of the pain or other symptoms; factors that precipitate and aggravate the symptoms; type, dosage, effectiveness, and side effects of medication to alleviate pain or other symptoms; treatment other than medication; any measures other than treatment the individual uses to relieve symptoms; and any other factors concerning the individual's functional limitations and restrictions.  SSR 16-3p, 2017 WL 5180304 at *7-8.  The ALJ need not analyze all seven factors but should show that he considered the relevant evidence.  *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005).  An ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms … and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  *Id.*; *see also Felisky v. Bowen*, 35 F. 3d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so.").  While a reviewing court gives deference to an ALJ's credibility determination, "the ALJ's credibility determination will not be upheld if it is unsupported by the record or insufficiently explained."  *Carr v. Comm'r of Soc. Sec.*, No. 3:18-cv-1639, 2019 WL 2465273, at *10 (N.D. Ohio April 24, 2019) (*citing Rogers*,

21

486 F.3d at 248-49), *report & recommendation adopted*, 2019 WL 3752687 (N.D. Ohio Aug. 8, 2019).

Here, the ALJ provided the following explanation for her treatment of Plaintiff's subjective complaints:

> As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are inconsistent because there is very little evidence of physical impairment, and mental symptoms are variable and overall controlled with medications, and he is able to work full time despite them, without evidence of significant change in symptoms from the time he was not working. … Regarding mental impairments, he reports issues with depression and anxiety, including irritability, dwelling on things, and attention/concentration, and he had issues associated with his prior "toxic" work environment, but his symptoms are variable, and he had improvement overall in his mood with medications, and although he has had some improvement overall since he started working full time in July 2020, he continues to report ongoing symptoms similar to those when he was not working. There is nothing significant to suggest that he was unable to work from July 2018 through June 2020, other than that he did not like the "toxic" work environment of his prior job. Once he obtained his current job, he appears to be doing better, which appears to be associated with the lower level of work stress in this environment.

(ECF No. 8, PageID #: 721).

Plaintiff argues that the ALJ's conclusion that his "mental symptoms are variable and overall controlled with medications, and he is able to work full time despite them, without evidence of significant change in symptoms from the time he was not working" is not supported by substantial evidence. (ECF No. 12 at 24). Plaintiff argues that his long work history and documented attempt to return to work "is not the picture of someone who is exaggerating or has no desire to work." (*Id.* at 26).

The Commissioner responds that the ALJ "gave more than an adequate explanation of her consideration of Plaintiff's subjective complaints" such that the Court should defer to the ALJ's

22

analysis.  (ECF No. 14 at 20).  The Commissioner points to the ALJ's discussion of the objective medical evidence, medical opinions, and Plaintiff's activities in support of her decision.  (*Id.* at 20-22).

The Court agrees with the Commissioner.  In support of his argument that the "ALJ's conclusion that Mr. Scaggs had the same symptoms and medical findings when he was out of work as when he returned to work in 202 [sic] is directly contradicted by the evidence," Plaintiff cites his earlier discussion regarding McLaughlin's opinion.  (ECF No. 12 at 24).  However, as the Court discussed above, the ALJ's conclusion that the records for the two periods contained similar reports such that they did not support an ability to work during one period and not another was supported by substantial evidence.  Similarly, in discussing the subjective complaints, the ALJ cited the fact that Plaintiff "continues to report ongoing symptoms similar to those when he was not working" as reason for finding Plaintiff's subjective complaints did not warrant greater limitations.  Considering the ALJ's decision as a whole, it is clear the ALJ considered the relevant SSR 16-3p factors and substantial evidence supports the ALJ's treatment of Plaintiff's subjective complaints.  Thus, the Court must defer to the ALJ's decision, "even if there is substantial evidence in the record that would have supported an opposite conclusion."  *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).

### 3. Hypothetical to Vocational Expert

Finally, Plaintiff argues that the ALJ "failed to present a hypothetical question to the vocational expert ('VE') that accurately described all the mental limitations found for Mr. Scaggs in the ALJ's own decision."  (ECF No. 12 at 26).  Specifically, Plaintiff argues that despite concluding that Plaintiff had moderate limitations in (1) understanding, remembering, or applying information; (2) concentrating, persisting, or maintaining pace; and (3) adapting or managing

himself, the ALJ's hypothetical limiting Plaintiff to "simple, routine task with routine workplace changes" did not account for Plaintiff's limitations in his ability to concentrate, persist, and maintain pace.  (*Id.* at 26, 28).

The Commissioner responds that the "ALJ was not required to include paced-based limitations in the RFC when the state agency psychologists noted that Plaintiff 'retains sufficient mental capacity to carry out 1-4 step commands with adequate persistence or pace,' and the RFC limiting Plaintiff to simple, routine work tasks was consistent with the doctor's findings."  (ECF No. 14 at 23 (internal citation omitted)).

"When the Commissioner seeks to rely on the testimony of the VE …, the testimony must have been given in response to a hypothetical question that accurately portrays the claimant's physical and mental impairments."  *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 436 (6th Cir. 2014) (citing *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 513, 516 (6th Cir. 2010)).  While "[a]n improper hypothetical cannot serve as substantial evidence" to support an ALJ's decision, the "hypothetical questions must incorporate only the limitations that the ALJ has accepted as credible."  *Id.*

Here, in discussing the medical opinions and setting forth the RFC, the ALJ noted that there was "nothing to support additional limitations beyond a restriction to simple, routine tasks, with only routine workplace changes."  (ECF No. 8, PageID #: 724).  With respect to Plaintiff's moderate limitation in understanding and remembering, the ALJ concluded such were accounted for "with a restriction to simple, routine tasks."  (*Id.* at PageID #: 726).  She reached a similar conclusion regarding the moderate limitation in attention and concentration.  (*Id.* ("Again, the records overall support impairment in managing attention and concentration for more detailed tasks, supportive of a restriction to simple, routine tasks.")).  The ALJ also specifically rejected

24

the need for limitations regarding pace.  (*See id.* at PageID #: 726 ("However, limitations regarding pace, excessive rest periods, and being distracted by others is unpersuasive …")).  In presenting the hypothetical question to the VE, the ALJ specified that the individual would be "limited to perform simple routine tasks and is limited to routine workplace changes."  (*Id.* at PageID #: 768).  Thus, the ALJ included the mental limitations she found supported in the hypothetical question to the vocational expert such that there was no error.  To the extent Plaintiff is asserting that the record supported additional limitations, because the ALJ's decision was supported by substantial evidence, as discussed above, the Court must defer to it, even if there is evidence in the record that would have supported an opposite conclusion.  *Wright*, 321 F.3d at 614.

## VI. Conclusion

Based on the foregoing, the Court AFFIRMS the Commissioner of the Social Security Administration's final decision denying Plaintiff benefits.  Plaintiff's Complaint is DISMISSED.

Dated: March 12, 2026

s/ *Carmen E. Henderson*
CARMEN E. HENDERSON
U.S. MAGISTRATE JUDGE